(119 So. 631)

CLARK et al. v. WHITFIELD et al.
(2 Div. 914.)

Supreme Court of Alabama. Dec. 20, 1928.

Rehearing Denied Jan. 24, 1929.

594

Jerome T. Fuller, of Centreville, and Stokely, Scrivner, Dominick & Smith, of Birmingham, for appellants.

Percy, Benners & Burr, of Birmingham, for appellees.

FOSTER, J. This is the second appeal in this case. The first appeal is reported in 213 Ala. 441, 105 So. 200. The bill was amended to meet the opinion of this Court and came on for final hearing and decree.

It is a bill for the sale of mineral land for division. The sale was made, and the Bessemer Coal & Land Company became the purchaser for $20,000. The Bessemer Company owned an undivided one-twelfth interest; appellants owned an undivided five-twelfths, and the other parties, not here complaining, own a half. The Bessemer Company has worked the Woodstock seam at Belle Ellen, and it is claimed leased the Youngblood seam to the Masena Company and the Thompson seam to the Clifton Company. The Bessemer Company had prior to the sale mined from the Woodstock seam 74,351 tons of coal as found by the special master. The date of the sale was March 13, 1926. The master also found that the Bessemer Company had mined 20,863 tons between that date and July 21, 1926, the date of the confirmation of the sale. But the master and trial court declined to allow any damages for waste covering the value of such coal taken between said dates.

The decree of the court appointed a special master. Appellants do not insist there was error in the order of sale of the land, but erred in appointing a special master and in referring the case to him to state an account between the Bessemer Company and each of appellants, charging said company with waste for coal taken from the three

seams and not accounted for and paid for. It is insisted that thereby the court referred to a master the determination of one of the principal equities. In this we cannot agree. The master was not directed to find and report anything but facts incidental to the relief which the court had decreed. The equities consisted of the interest of each party, and that the land could not be partitioned without a sale. This the court found and decreed. The state of accounts growing out of waste was not a primary equity, but merely incidental to relief primarily decreed, and quite appropriately referred to a master. In a decision of this court, recently rendered (Cone v. Bargainier, ante, p. 292, 118 So. 342), it has again approved such a proceeding in aid of its decree.

■■ It is next insisted that there was error in confirming the report of sale of the property. This was after extensive advertising, and at public outcry, with no effort to show any character of unfairness. One of the complainants testified that it was worth $100,000. A witness employed by complainants to examine the property testified it was worth $80,000. His examination consisted of about a half day's visit; he had not operated in the immediate coal district for many years before then. His testimony showed that his opinion did not give due regard to actual conditions which existed there. On the other hand, B. F. Roden, H. L. Badham, president of the Bessemer Company, Walter E. Henley, president of the Birmingham Savings & Trust Company, and Dr. C. W. Randall, president of the Masena Company, and L. W. Geoheagin, general manager of the Gulf States Steel Company, all experienced coal operators in that particular district or familiar with such operations, testified that $20,000 was a fair and reasonable price. Since the sale, no one has offered more, and everybody had a full opportunity at the sale. The master's finding was in accord with the evidence, and besides the witnesses were examined orally before him. He reported that the evidence was "clear and convincing to his mind that the $20,000 bid for said property was a fair and adequate price." Indulging the proper presumption in favor of the report of the special master on reference ordered by the court, and on objection to confirmation of the sale, and considering the evidence before the master, we cannot say that the court erred in confirming the report. Buttrey v. Buttrey, ante, p. 268, 118 So. 282; Cone v. Bargainier, ante, p. 292, 118 So. 342.

■■ Appellants next insist that the court should have charged the Bessemer Company with the value of 20,863 tons of coal mined between the date of purchase and the date of confirmation. They cite no authority to sustain this principle, but merely state their contention. The question has been decided by this court contrary to appellants' contention in our cases of Patten v. Swope, 204 Ala. 169,

85 So. 513, and Thomas v. Caldwell, 136 Ala. 518, 34 So. 949. After confirmation the title and rights of the purchaser relate back to the date of the sale. He must bear the losses that intervene and is entitled to the intervening benefits and advantages. We think it only necessary to cite our decisions which determine that question.

■ As above stated, the master has found and reported the amount of coal mined by the Bessemer Company in the Woodstock seam. The land was chiefly, if not solely, valuable for the coal in it. The master found that seven cents per ton was a reasonable amount to be accounted for by the Bessemer Company for such operations. The court confirmed the report and decreed an accounting accordingly. Appellants complain that they did not get the value of the coal after its severance as it lay in the mine. They have cited authorities sustaining the doctrine that under certain circumstances a tenant in common may sue in trover for the conversion of jointly owned personal property. They also cite the rule that, as against an inadvertent tort-feasor, the measure of damages in trespass to land is the value of the property severed from the freehold as it lay, immediately following its severance. The rules cited are certainly well established, but do not measure the liability of one tenant in common to another for waste committed while in possession of a freehold owned by cotenancy. At common law the nature of such remedy was by an action of account or bill in equity for an account. He was not treated as a tort-feasor. Darden v. Cowper, 52 N. C. 210, 75 Am. Dec. 461, cited in our case of Sanders v. Robertson, 57 Ala. 471, with the following quotation: "If a tenant in common receives more than his share of the profits, by an excessive use of the property, as by wearing out the land, or by an improper use of it, as by cutting down the timber and selling it, he cannot be treated as a tortfeasor, but the remedy of the cotenant is by an action of account, or, a bill in equity for an account." This rule is stated also in 7 R. C. L. 898. Early statutes in England, adopted in American jurisdictions, gave rise to an action on the case for waste, called an action for waste. 7 R. C. L. 899. The duty to account by one tenant in common to another for depletion and destruction pro tanto, without the consent of the latter, is waste. Clark v. Whitfield, 213 Ala. 441 (13) 105 So. 200 (the former appeal in this case); 38 Cyc. 89; Freeman on Cotenancy, p. 329, § 249 (a); 7 R. C. L. 898.

An action at law for waste, or, as here, in equity for an accounting for waste, has a clear and distinct field of operation as between tenants in common of real estate. The courts have not held the action of trover for the conversion of what is severed as properly applicable to the relation of tenants in common. The doctrine of waste is also applied to other relations, such as landlord and tenant, and

596

mortgagees in possession, where like rules obtain. American Freehold Land & Mtg. Co. v. Pollard, 132 Ala. 155, 32 So. 630; Perdue v. Brooks, 85 Ala. 459, 5 So. 126. The following quotation - from Freeman on Cotenancy, § 249-a, is directly in point here: "As a general proposition.each cotenant is entitled to use, and every cotenant is forbidden to injure or destroy the common property. Every use, however, involves some slight injury or destruction; and in the case of mining property there can be no valuable use without a removal, and, in effect, a destruction of a part of the common property. Some of the cotenants may desire to operate the mine, while the others may be unwilling to do so. The property is obviously of no value, except for the purposes of sale, unless it can be used; and the only use which its owners ever contemplated for it, and of which it is susceptible, consists of the removal from it of some part of its only element of value. Through such removal its value must be diminished, and, if sufficiently long continued, must be exhausted. The cotenants who desire to use the mine must either be deprived of all use thereof, or if allowed to use, must assume all risk and expense, and incur the liability to account with the others in case the use proves profitable, or the non-assenting cotenants must either join in the mining operations, or submit to a use by the others which will consume or destroy a part of the property. As a mine already opened must have been intended to be used, and in its use to be finally mined out, and as the cotenants must have acquired their interests in contemplation of and subject to this use, and as each cotenant is generally entitled to such use of the common property as is consistent with its character and circumstances, the better rule seems to be that if some of the cotenants choose not to enter upon and work the mine, they can neither enjoin the others from so doing, nor compel them to account after having so done" (for profits realized).

We hold therefore than an action of waste, or an accounting in equity as for a waste, is the appropriate measure of recovery in this case.

In a recent Mississippi case this subject was discussed. Memphis S. & G. Co. v. Archer, 137 Miss. 558, 102 So. 390. It related to gravel and was between tenants in common. It was pointed out that the usual way to mine such product was by contracts providing for royalties; that there is a market value of such contracts by the cubic yard. It then quotes from New Domain Oil & Gas Co. v. McKinney, 188 Ky. 183, 221 S. W. 245, as follows: "'Where a cotenant of minerals, as petroleum oil, occupies and works them exclusively, he is liable to a cotenant to pay the universal * * * royalties for the right of mining the particular substance in the particular locality, if he acted in good faith in so mining.' See, also, Canon Co. v. Yarwood [27

Wash. 271, 67 P. 749], 91 Am. St. Rep. 877; Cosgriff v. Dewey [164 N. Y. 1, 58 N. E. 1], 79 Am. St. Rep. 621; Fulmer's Appeal, 128 Pa. 24, 18 A. 493, 15 Am. St. Rep. 662."

It seems to be well established, from the authorities cited, that the market value of so-called mining leases, in the locality of such mining operations upon a royalty basis, is an appropriate method of measuring liability of a tenant in common, provided there is a custom for so measuring such value sufficient to establish a market on that basis. It is sometimes stated that the proper measure of damages for waste is the depreciation in value of the inheritance. Am. Freehold L. & M. Co. v. Pollard, supra; Perdue v. Brooks, supra; 38 Cyc. 90, 91, 40 Cyc. 534. Our case of Gulf Red Cedar Co. v. Crenshaw, 188 Ala. 606, 65 So. 1010, is not in conflict with the foregoing views. In that case the question was as to timber cut by a tenant in common. The court held that the tenant cutting the timber could not "be treated as a trespasser," and fixed the damages for the timber at figures which, as we understand from the case, were its value standing on the land, and before it was cut. It is said in that case "the bone of contention is the amount of cedar taken; not so much its value." It is sometimes stated that the value of the wasted product should be estimated in situ. Memphis S. & G. Co. v. Archer, supra.

In the case of Raynolds v. Hanna (C. C.) 55 F. 783, 800, it is said that royalty is "the most appropriate word" to apply to rental "based upon the quantity of coal or other mineral that is or may be taken from the mine." In 4 C. J. 1027, as applied to mineral leases, royalty "means a certain percentage or proportion specifically stated or on a graduated scale according to the value of the ore, based on the net proceeds, * * * or otherwise as the parties may agree." To operate mineral rights is usually termed a lease. 49 C. J. 1027 et seq. But strictly speaking it is not. The royalty, though sometimes spoken of as equivalent to rent, is really but a means of measuring the value of the ore in situ for which the operator is to pay. This is on the same principle as though he agreed to pay a stipulated sum per ton as the purchase price of the ore as it lay in its bed. It is but the method the parties agree upon as the value of such ore before operations begin. It is on the same principle as stumpage for timber rights; as a measure of the value of the timber before it is cut. When lands are chiefly valuable for their timber or minerals, and they are taken away by a cotenant, the depreciation in value of the land is sometimes measured by the value of the timber or minerals taken away, estimated for such purpose at its value before severance. It is therefore under these circumstances not very material whether the measure of damages for waste be stated to be the depreciation in the value of the land, as some authorities say, or the

value of the timber or mineral before severance.

In this case, the master found, in effect, that the value of the coal before severance was equal to the market value of a coal lease of the land on a royalty basis; or that the same truly measured the depreciated value of the land. We conclude that the method so adopted for such measurement is in accord with the rules of law in such cases. No rule of law was cited, and we have found none, which prescribes a measure of damages other than as stated in such circumstances.

The finding of the master was sustained by the evidence. The presumption as to the correctness of his finding is such that it will not be disturbed unless it appears to us to be clearly erroneous. Buttrey v. Buttrey, supra; Cone v. Bargainier, supra. Such report, when based on oral evidence, has the effect of a finding by the jury, and all reasonable presumptions are indulged to support it. Cone v. Bargainier, supra. Many additional authorities could be cited. However, the preponderance of the evidence supported the master's finding.

The master found that the Bessemer Company had not taken any coal from the Youngblood or Thompson seams, which it has not accounted for; that for the coal taken by the Masena Company, as lessees of the Bessemer Company, it has accounted to appellants and other interested parties on the basis of the contract price. Appellants claim that because their lease to the Bessemer Company of the Youngblood seam was not transferable, the act of the Bessemer Company in leasing the land to the Masena Company was a trespass, for which the Bessemer Company is due the appellants as a tort-feasor. They do not claim that the Bessemer Company has not accounted for all the coal mined by the Masena Company on the basis of the stipulated royalty. They make the same claim as to the Thompson seam under lease by the Clifton Company from the Bessemer Company. We cannot agree with appellants in this contention. For reasons heretofore given as analogous here, we think that the Bessemer Company is not required to account for more than the reasonable value of the ore before severance, though the contract of lease to the Bessemer Company expressly stipulated against a trespass. The Bessemer Company was a tenant in common, and, as heretofore pointed out, if it committed waste, or allowed it to be done, the extent of its liability was the reasonable loss to the other tenants in common, which is the value of the mineral before severance, or the depreciation in the value of the freehold.

We have considered all the assignments of error discussed in brief of appellants. It is our judgment that there is no error shown in any respect pointed out in the briefs. The trial court gave effect to the legal principles which we think control this case, and the master made his findings upon well-sustained facts. The result is an affirmance.

Affirmed.

ANDERSON, C. J., and THOMAS and BROWN, JJ., concur.